# DEPARTMENT of the INTERIOR

## news release

OFFICE OF THE SECRETARY

For Release February 5, 1975                 McGarvey 202/343-5634

### MORTON ISSUES POLICY STATEMENT
### ON INDIAN USE OF BIRD FEATHERS

Secretary of the Interior Rogers C. B. Morton today issued a policy state-
ment concerning Indian cultural and religious use of migratory bird feathers
and parts.  Following is the text of the statement.

"I am aware that American Indians are presently experiencing uncer-
tainty and confusion over the application of Federal bird protection laws
to Indian cultural and religious activities.  Apparently, this confusion
and concern may have resulted, in part, from this Department's enforcement
activities under such laws.  This statement is intended to clarify the
Department of the Interior's responsibilities and intentions, and to ease
the minds of American Indians.

"The Department of the Interior recognizes the unique heritage of
American Indian culture.  It also recognizes that American Indians have
a legitimate interest in expressing their cultural and religious way of
life.  At the same time, both the Department of the Interior and American
Indians share an additional responsibility to conserve wildlife resources,
including federally protected birds.

"As a result of meetings between agencies of the Department of the
Interior, the Association for American Indian Cultural and Traditional
Activities, and others, I can assure American Indians that our policy is
to permit them to engage in the following activities without fear of
Federal prosecution, harassment, or other interference.

Attachment 1

(over)

"1.  American Indians may possess, carry, use, wear, give, loan, or exchange among other Indians, without compensation, all federally protected birds, as well as their parts or feathers.

"2.  American Indians who wish to possess bird feathers or parts to be worked on by tribal craftsmen for eventual use in Indian religious or cultural activities may transfer such feathers or parts to tribal craftsmen without charge, but such craftsmen may be compensated for their work.

"However, the Department of the Interior will continue to enforce against all persons those Federal laws prohibiting the killing, buying or selling of eagles, migratory birds, or endangered species, as well as those laws prohibiting the buying or selling of the parts or feathers of such birds and animals.

"I encourage American Indians to express their identity and to freely pursue their cultural and religious practices.  At the same time, I encourage them to support the purposes of the Federal bird protection laws. There is much work to be accomplished to further clarify the rights and obligations of American Indians with respect to Federal bird protection laws, and special efforts will be made to conduct a two-way education process between Government employees and Indian communities.  In addition, we have agreed to work in a spirit of cooperation with the Association for American Indian Cultural and Traditional Activities, and other interested Indian representatives, in order to harmonize the policies, practices, and procedures for enforcement of the Federal bird protection laws with the legitimate needs of Indians.  This includes review of Federal regulations, with probable changes where the legitimate needs of American Indians can be legally recognized without harming federally protected birds.

"In this regard, one area of discussion should be the possibility of American Indians sharing with Federal officials the responsibilities of wildlife management and enforcement through the adoption of tribal ordinances designed to conserve federally protected birds.

"In the past, one problem has been that legitimate sources of feathers, which might have been available to the Department for distribution to American Indians, have not been fully utilized.  We are presently developing better procedures to collect and distribute eagle feathers from the Fish and Wildlife Service repository at Pocatello, Idaho, where feathers of eagles found dead are stored.  In addition, we will make an effort to distribute the feathers and parts of other migratory birds to Indians.

"I hope that this statement will help to take away the uncertainty and confusion presently experienced by American Indians.  I hope also that our efforts will encourage tradition, culture, and religious activities among American Indians, while at the same time promoting a mutual effort to protect and conserve federally regulated birds.

x     x     x

INT: 3449-75



# Office of the Attorney General
## Washington, D.C. 20530

OCT 1 2 2012

**MEMORANDUM**

TO:        ASSISTANT ATTORNEY GENERAL, ENVIRONMENT AND NATURAL
                RESOURCES DIVISION

                ALL UNITED STATES ATTORNEYS

                DIRECTOR, EXECUTIVE OFFICE FOR UNITED STATES ATTORNEYS

FROM:     THE ATTORNEY GENERAL

SUBJECT:    Possession or Use of the Feathers or Other Parts of Federally Protected Birds for
               Tribal Cultural and Religious Purposes

       This memorandum formalizes and memorializes the longstanding policy and practice of
the Department of Justice regarding the possession or use of federally protected birds, bird
feathers, or other bird parts for the cultural and religious purposes of federally recognized Indian
tribes.[1]  This memorandum also provides background and guidance regarding this policy.

       The Department of Justice recognizes that many Indian tribes and tribal members use,
and traditionally have used, federally protected birds, bird feathers, or other bird parts for their
tribal cultural and religious expression.  Indeed, the eagle plays a unique and important role in
the religious and cultural life of many Indian tribes.  And in light of the important government-
to-government relationship that the United States has with federally recognized tribes, the United
States has a strong interest in accommodating the interests of these tribes by protecting the
ability of their members to meaningfully practice their religions and preserve their cultures.[2]  In
addition, accommodating these tribal interests is integral to the federal commitment to foster
tribal self-determination and self-governance.

       At the same time, tribes and their members and the United States share an interest in –
and a responsibility for – protecting this Nation's scarce and precious wildlife resources.  Federal
wildlife laws are essential to preserving natural resources – including the eagle and other
migratory birds – that are vitally important to this Nation.[3]  It is a federal enforcement priority to
prosecute those who violate federal laws by engaging in commercial activities involving
federally protected birds, bird feathers, or other bird parts, or by killing such birds without

authority under federal law. The objective of these enforcement efforts is to reduce and eliminate the unlawful taking of federally protected birds by prosecuting not only individuals who take protected birds but also individuals who seek to profit from the commercialization of federally protected birds or their feathers or other parts.

In short, the Department of Justice is committed to robust enforcement of federal laws protecting birds while respecting tribal interests in the use of eagle feathers and other federally protected birds, bird feathers, and other bird parts for cultural and religious purposes.

<u>Background</u>

The Department of Justice policy memorialized in this memorandum is consistent with the longstanding policy of the Department of the Interior. In 1975, then-Secretary of the Interior Rogers C. B. Morton issued a policy statement concerning Indian cultural and religious use of migratory bird feathers and parts, which has become known as the "Morton Policy."[4] The Morton Policy was issued to "clarify the Department of the Interior's responsibilities and intentions" as to enforcement of federal laws protecting eagles and to "ease the minds of American Indians" who had raised concerns about the application of federal wildlife protection laws to their cultural and religious activities.[5]

Pursuant to the Morton Policy, the Department of the Interior has long permitted members of federally recognized tribes to engage in specified activities, including the possession and use of federally protected birds, as well as their parts or feathers, "without fear of Federal prosecution, harassment, or other interference." The Morton Policy also affirmed that the government would not permit anyone, including members of federally recognized tribes, to kill federally protected birds without a permit or to engage in commercial trade in federally protected birds, bird feathers, or other bird parts. The government would continue to enforce against all persons federal laws prohibiting the killing of protected birds and prohibiting commercial activities involving protected birds and their feathers and parts.

The Morton Policy has guided the federal government's approach to enforcement of federal laws protecting birds ever since it was issued. Nonetheless, I understand that there continues to be some uncertainty and concern regarding enforcement of federal bird protection laws as related to the cultural and religious activities of members of federally recognized tribes. I am therefore issuing this memorandum in order to clarify and confirm that the Department of Justice continues to exercise its prosecutorial discretion in a manner consistent with the Morton Policy.

<u>Policy</u>

The Department of Justice is committed to balancing enforcement of the Nation's wildlife laws with acknowledgment of the cultural and religious needs of federally recognized Indian tribes with which the United States shares a government-to-government relationship. This policy is intended to ensure coordination and continued consistency with the Morton Policy and to clarify certain issues not expressly or fully addressed in the Morton Policy itself. The

Memorandum from the Attorney General                                    Page 3
Subject:  Eagle Feathers Policy

Department of Justice has worked very closely with the Department of the Interior in developing
this policy.  This policy is intended to ensure a consistent and uniform approach across the nation
to enforcement of federal laws protecting birds.[6]

    Accordingly, consistent with the Morton Policy and the Department of Justice's
traditional exercise of its discretion, a member of a federally recognized tribe engaged only in the
following types of conduct will not be subject to prosecution:

- Possessing, using, wearing, or carrying federally protected birds, bird feathers, or
  other bird parts;

- Traveling domestically with federally protected birds, bird feathers, or other bird
  parts or, if tribal members obtain and comply with necessary permits, traveling
  internationally with such items;[7]

- Acquiring from the wild, without compensation of any kind, naturally molted or
  fallen feathers of federally protected birds, without molesting or disturbing such
  birds or their nests;

- Giving or loaning federally protected birds or the feathers or other parts of such
  birds to other members of federally recognized tribes, or exchanging federally
  protected birds or the feathers or other parts of such birds with other members of
  federally recognized tribes, without compensation of any kind;

- Providing the feathers or other parts of federally protected birds to craftspersons
  who are members of federally recognized tribes to be fashioned into objects for
  eventual use in tribal religious or cultural activities.  Although no compensation
  may be provided and no charge made for such feathers or other bird parts, tribal
  craftspersons may be compensated for their labor in crafting such objects.

    Members of federally recognized tribes are covered by this policy regardless of whether
they have a U.S. Fish and Wildlife Service permit.[8]

    The Department of Justice balances its commitment to accommodating the needs of
federally recognized tribes with its commitment to enforcement of the Nation's wildlife laws.
Thus, the Department of Justice will continue to prosecute tribal members and non-members
alike for violating federal laws that prohibit the killing of eagles and other migratory birds or the
buying or selling of such birds or the feathers or other parts of such birds.[9]  The terms "buying,"
"selling," and "compensation" include the exchange of federally protected birds, bird feathers, or
other bird parts for cash, services, goods, or anything other than protected birds, bird feathers, or
other bird parts.

    The Department of Justice's Environment and Natural Resources Division (ENRD) and
United States Attorneys' Offices work closely with the Department of the Interior's U.S. Fish
and Wildlife Service on enforcement of federal laws protecting birds.  It is a goal of both the

Memorandum from the Attorney General                                    Page 4
Subject:  Eagle Feathers Policy

Department of Justice and the Department of the Interior that these enforcement efforts are
carried out in a way that is consistent with the policies of both agencies, as described in this
memorandum.  Prosecutors should be aware that the Department of the Interior has a
longstanding internal procedure regarding review of cases involving members of federally
recognized tribes, which governs decisions by the Department of the Interior on the referral of
cases to Department of Justice prosecutors.

        United States Attorneys' Offices shall consult with the Assistant Attorney General of
ENRD or her designee, the Chief of ENRD's Environmental Crimes Section, if they have
questions regarding whether particular conduct is consistent with this policy or whether
exceptional circumstances exist.  In addition, in light of the significant and important issues these
cases raise, it is strongly recommended that Assistant U.S. Attorneys handling any case
involving Native Americans and federally protected birds, bird feathers or other bird parts,
consult at an early stage of their investigation or prosecution with ENRD's Environmental
Crimes Section.  Among other things, prosecutors are strongly encouraged to consult with
ENRD in any such case (involving Native Americans and federally protected birds, bird feathers,
or other bird parts) in which an issue is raised regarding a treaty with an Indian tribe, the First
Amendment of the United States Constitution, the American Indian Religious Freedom Act, or
the Religious Freedom Restoration Act.

        Consistent with the sovereign status of Indian tribes, and with this Department's
commitment to fostering tribal self-determination, prosecutors are also encouraged to consider
whether prosecution of particular cases would be more appropriately handled by tribal
prosecutorial authorities in lieu of federal prosecution.  *See* U.S. Attorneys' Manual Ch. 9-
27.220(A)(2).

        This policy is based on the special relationship that the federal government has with
federally recognized tribes.  This policy is not intended to address or change how the Department
of Justice handles cases involving those who are not members of federally recognized tribes,
including non-Indians or members of state-recognized tribes or other groups or organizations.
The traditional elements of federal prosecutorial discretion continue to apply in all such cases.
*See Principles of Federal Prosecution*, U.S. Attorneys' Manual Ch. 9-27.000.  Prosecutors retain
the discretion to consider all appropriate factors, such as the nature and seriousness of the offense
and the culpability of the offender, in determining whether to pursue a particular prosecution that
would not be inconsistent with this policy.  *See, e.g.*, U.S. Attorneys' Manual Ch. 9-27.230-250
(describing factors that may be relevant in determining whether to prosecute) and 9-27.260
(detailing impermissible considerations).  In exercising their discretion in such cases, prosecutors
should be aware that it has been and continues to be the priority of the Department of Justice and
the Department of the Interior to focus wildlife enforcement resources on those cases involving
illegal activities that have the greatest negative impact on protected species, such as the unlawful
take of protected wildlife and unlawful commercial activities involving protected wildlife.[10]

        This policy has been promulgated solely for the purpose of internal Department of Justice
guidance.  It is not intended to, does not, and may not be relied upon to create any rights,
substantive or procedural, that are enforceable at law by any party in any matter, civil or

Memorandum from the Attorney General
Subject:  Eagle Feathers Policy

Page 5

criminal, nor does it place any limitations on otherwise lawful litigative prerogatives of the
Department of Justice.


cc:      Director, Federal Bureau of Investigation
         Director, Office of Tribal Justice

Attachment

Notes

---

[1] The term "federally recognized tribes" (also referred to in this memorandum as "Indian tribes" or "tribes") means all Indian tribes (including Alaska Native entities) identified in the most recent list of Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs published in accordance with section 104 of Public Law 103-454 (108 Stat. 4792; 25 U.S.C. § 479a-1) and any other Indian tribes acknowledged by the United States Bureau of Indian Affairs and identified for inclusion in such a list.

[2] This interest is reflected in statutes, Executive Orders, and case law. *See, e.g.*, 16 U.S.C. § 668a (authorizing exceptions to the Bald and Golden Eagle Protection Act "for the religious purposes of Indian tribes"); 42 U.S.C. § 1996 (the American Indian Religious Freedom Act); Executive Order 13007 (May 24, 1996) (Indian Sacred Sites); Presidential Memorandum on Policy Concerning Distribution of Eagle Feathers for Native American Religious Purposes, 59 F.R. 22953 (Apr. 29, 1994); *United States v. Wilgus*, 638 F.3d 1274, 1285 (10th Cir. 2011) (finding that regulatory scheme concerning tribal member possession of eagle feathers for religious purposes serves compelling governmental interests in protecting eagles and in "protecting and fostering [the] culture and religion . . . of federally-recognized Indian tribes"); *United States v. Eagleboy*, 200 F.3d 1137 (8th Cir. 1999) (upholding Morton Policy, defined *infra* at 2 and n.4). The unique legal and political relationship that the United States shares with federally recognized tribes has been addressed by the Supreme Court in *Morton v. Mancari*, 417 U.S. 535 (1974), and is further addressed in Executive Order 13175 (Nov. 6, 2000) (Consultation and Coordination with Indian Tribal Governments) and Presidential Memorandum on Tribal Consultation, 74 F.R. 57881 (Nov. 5, 2009).

[3] Federal wildlife laws that protect birds (and the feathers and parts thereof) include the Bald and Golden Eagle Protection Act, 16 U.S.C. §§ 668-668d, the Migratory Bird Treaty Act, 16 U.S.C. §§ 703-712, the Lacey Act, 16 U.S.C. §§ 3371-3378, and the Endangered Species Act, 16 U.S.C. §§ 1531-1544. The term "federally protected bird," as used in this memorandum, refers to any bird that is protected under any federal wildlife law.

[4] Rogers C. B. Morton, Secretary of the Interior, Policy Statement on Indian Use of Bird Feathers (Feb. 5, 1975). A copy of the Morton Policy is attached.

[5] *Id.*

[6] Neither the Morton Policy nor this policy is intended to address issues regarding live birds.

[7] Enrolled members of federally recognized tribes may legally transport federally protected birds, bird feathers, or other bird parts internationally if they obtain a permit to do so. *See* 50 C.F.R. § 22.22; *see also* www.fws.gov/le/public-bulletin-native-american-travel-overseas.html. In addition, U.S. Fish and Wildlife Service policy allows enrolled members of federally recognized tribes to travel without a permit to Mexico or Canada with eagles, eagle parts, or eagle feathers under certain conditions, including that the tribal member enters and leaves the United States with the same items. *See* U.S. Fish and Wildlife Service, Notice to the Wildlife Import/Export Community re: Transport of Eagle Items Within North America (Feb. 1, 2003) (www.fws.gov/le/public-bulletin-transport-eagle-items.html). U.S. Fish and Wildlife Service policy similarly allows Canadians who present a "Certificate of Indian Status" card issued by the federal Government of Canada to travel into and out of the United States with eagles, eagle

Memorandum from the Attorney General                                          Page 7
Subject: Eagle Feathers Policy

---

parts, or eagle feathers under conditions similar to those required of members of tribes recognized by the United States. *Id.* Note that these policies address transport requirements under federal wildlife laws and do not address the applicability of customs and related laws.

[8] The U.S. Fish and Wildlife Service issues permits for receipt and possession of eagle carcasses, eagle feathers, and eagle parts to tribal members who apply for and receive such items through the National Eagle Repository. Members of federally recognized tribes are not, however, required to have permits to engage in the conduct that this policy allows (other than any permits that may be necessary for international travel, as described in note 7).

[9] Enrolled members of federally recognized tribes may legally kill federally protected birds only if they obtain a permit to do so and comply with its conditions. *See* 50 C.F.R. § 22.22; U.S. Fish and Wildlife Service, Federal Fish and Wildlife Permit Application Form (Type of Activity: Native American Eagle Take). Similarly, a U.S. Fish and Wildlife Service permit is required to salvage a carcass or part of a federally protected bird or anything from such a carcass or part, except naturally molted or fallen feathers as provided under this policy. *See* 16 U.S.C. § 668(a), 668a, 668c; 16 U.S.C. § 703(a), 704(a); 50 C.F.R. 10.12.

[10] *See generally* U.S. Fish and Wildlife Service, Enforcement Priorities, 444 FW 1, ¶¶ 1.2A, 1.3A (Aug. 25, 2005), available at www.fws.gov/policy/444fw1.html.



United States Department of the Interior
OFFICE OF THE SOLICITOR
Washington, D.C. 20240

January 15, 2021

M-37063

Memorandum

To:       Secretary
            Assistant Secretary – Indian Affairs
            Assistant Secretary – Fish and Wildlife and Parks

From:     Solicitor

Subject:   Withdrawal of Solicitor Opinion M-36936, "Application of Eagle Protection and Migratory Bird Treaty Acts to Reserved Indian Hunting Rights;" Solicitor Opinion M-36926, "Application of the Endangered Species Act to Native Americans with Treaty Hunting and Fishing Rights;" and Solicitor Opinion M-27690, "Migratory Bird Treaty Act"

On January 14, 2021, the Deputy Solicitor for Indian Affairs transmitted the attached memorandum ("Deputy Solicitor's Memorandum") recommending that I withdraw the below Solicitor Opinions ("Opinions") that analyze the impact of certain federal conservation statutes on the reserved hunting and fishing rights of individual members of recognized Indian tribes ("tribal members").[1]

- Solicitor Opinion M-36936, "Application of Eagle Protection and Migratory Bird Treaty Acts to Reserved Indian Hunting Rights" (Sol. Op. M-36936)[2]

- Solicitor Opinion M-36926, "Application of the Endangered Species Act to Native Americans with Treaty Hunting and Fishing Rights" (Sol. Op. M-36926)[3]

- Solicitor Opinion M-27690, "Migratory Bird Treaty Act" (Sol. Op. M-27690)[4]

These Opinions undertake to determine whether Congress intended to abrogate the rights of tribal members guaranteed by treaty, statute, or executive order through enactment of the Bald and Golden

---

[1] Memorandum from Kyle E. Scherer, Deputy Solicitor for Indian Affairs, to Daniel H. Jorjani, Solicitor, "Applicability of the Endangered Species Act and Migratory Bird Treaty Act to Reserved Tribal Hunting and Fishing Rights" (Jan. 14, 2021).

[2] William H. Coldiron, Solicitor Opinion M-36936, "Application of Eagle Protection and Migratory Bird Treaty Acts to Reserved Indian Hunting Rights" (June 15, 1981).

[3] Clyde O. Martz, Solicitor Opinion M-36926, "Application of the Endangered Species Act to Native Americans with Treaty Hunting and Fishing Rights" (Nov. 4, 1980).

[4] Charles Fahy, Solicitor Opinion M-27690, "Migratory Bird Treaty Act" (June 15, 1934) (overruled to the extent of conflict with Sol. Op. M-36936).

Eagle Protection Act ("BGEPA"),[5] the Endangered Species Act ("ESA"),[6] and the Migratory Bird Treaty Act ("MBTA").[7]  The Opinions all predate the Supreme Court's decision in *United States v. Dion*,[8] and thus rely on abrogation analyses that are inconsistent with intervening case law. Understandably, this is most apparent in Sol. Op. M-27690, where the Solicitor's finding of abrogation relies on an interpretation of the MBTA that is in conflict with the principles of federal Indian law and statutory construction that have guided federal courts and the Department for over fifty years.[9]  Further demonstrating the analytical challenges of the Solicitor's reasoning, Sol. Op. M-27690 favorably cites to an 19th-century case regarding abrogation that has since been "repudiated" by the Supreme Court.[10]

That a Solicitor Opinion from 1934 no longer reflects the current state of the law is unsurprising, particularly where it seeks to address an issue of federal-tribal relations.  The same can be said for Sol. Op. M-36926 and Sol. Op. M-36936.  Though they are each relatively more recent, the Supreme Court's foundational opinion in 1986 regarding abrogation of treaty rights rendered their conclusions open to criticism shortly after their publication.

This Opinion does not represent a fulsome review of the issues raised in the Deputy Solicitor's Memorandum.  That said, I agree that the abrogation analyses contained in the Opinions are inconsistent with the standard articulated by the Supreme Court in *Dion*.[11]  Further, and for the reasons discussed in the Deputy Solicitor's Memorandum, I am of the opinion that neither the ESA nor the MBTA possess the requisite plain language or legislative history demonstrating congressional intent to abrogate reserved hunting and fishing rights.  This result is consistent with those reached by the most recent federal circuit court and district court to have considered the issue.[12]

Despite this, however, it is also my view that the Solicitor's conclusion in Sol. Op. M-36926 regarding the ESA was correct, even though his abrogation analysis was ultimately flawed.  It remains the position of the United States that the federal government has the authority to enforce the ESA against tribal members.[13]  Further, it is settled law that each of the States has the ability to

---

[5] Act of June 8, 1940, ch. 278, 54 Stat. 250, *codified as amended at* 16 U.S.C. § 668.

[6] Pub. L. No. 93-205, 87 Stat. 884, *codified as amended at* 16 U.S.C. § 1531 *et seq.*

[7] Act of July 3, 1918, ch. 128, 40 Stat. 755, *codified as amended at* 16 U.S.C. §§ 703-712.

[8] 476 U.S. 734 (1986).

[9] Specifically, Sol. Op. M-27690 finds that Congress intended the MBTA to abrogate the treaty-protected hunting rights of the Swinomish Tribe based, in part, on the fact that "[t]he [underlying treaty between the United States and Great Britain] and statute contain no provision excluding the Indians or Indian reservations from their operation." This analysis inverts the direction provided by the Supreme Court in multiple cases subsequent to 1934, which require the inclusion of statutory language or other similar clear and convincing evidence of congressional intent. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202–03 (1999) (collecting cases).

[10] *Compare* Sol. Op. M-27690 (favorably citing *Ward v. Race Horse*, 163 U.S. 504 (1896)) *with Herrera v. Wyoming*, 139 S. Ct. 1686, 1697 (2019) ("*Race Horse* is repudiated to the extent it held that treaty rights can be impliedly extinguished at statehood").

[11] *Id.* at 739-740 ("What is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty").

[12] *United States v. Dion*, 752 F.2d 1261, 1270 (8th Cir. 1985) (en banc), *overruled on other grounds*, 476 U.S. 734; *United States v. Turtle*, 365 F. Supp. 3d 1242 (M.D. Fla. 2019).

[13] The rationale for continued federal enforcement of the ESA in the absence of abrogation of reserved hunting or fishing rights can be found in the federal district court opinion in *Turtle*.  It relies on the Supreme Court's reasoning in *Puyallup* (defined below) and permits federal regulation of reserved hunting and fishing on the basis of "conservation necessity."

regulate reserved hunting and fishing, consistent with the Supreme Court's "conservation necessity" test.[14]

It is not typically the practice of the Office of the Solicitor to revisit decades-old Solicitor Opinions, particularly where their conclusions may not be wholly incorrect. In this case, however, federal prosecutors have relied on these published opinions to support arguments that are inconsistent with case law, as well as the Department's long-standing approach to advising whether Congress intended through a particular statute to abrogate a treaty or treaty rights. Accordingly, I hereby withdraw Sol. Op. M-27690, Sol. Op. M-36926, and Sol. Op. M-36936, to the extent they conflict with *Dion* and related case law.[15]



Daniel H. Jorjani

---

[14] *Puyallup Tribe v. Dep't of Game of Wash.*, 433 U.S. 165 (1977) (*Puyallup III*); *Dep't of Game of Wash. v. Puyallup Tribe*, 414 U.S. 44 (1973) (*Puyallup II*); *Puyallup Tribe v. Dep't of Game of Wash.*, 391 U.S. 392 (1968) (*Puyallup I*) (collectively "*Puyallup*").
[15] This Opinion is binding on the Department but is not intended to limit or constrain how any other federal agency interprets or applies the ESA or the MBTA.

3



United States Department of the Interior
OFFICE OF THE SOLICITOR
Washington, D.C. 20240

January 14, 2021

Memorandum

To:         Daniel H. Jorjani, Solicitor

From:       Kyle E. Scherer, Deputy Solicitor for Indian Affairs
            Eric N. Shepard, Associate Solicitor, Division of Indian Affairs   ERIC SHEPARD   Digitally signed by ERIC SHEPARD Date: 2021.01.14 15:16:08 -05'00'
            Samuel E. Ennis, Assistant Solicitor, Division of Indian Affairs   SAMUEL ENNIS   Digitally signed by SAMUEL ENNIS Date: 2021.01.14 14:33:53 -05'00'

Subject:    Applicability of the Endangered Species Act and Migratory Bird Treaty Act to
            Reserved Tribal Hunting and Fishing Rights

## I.   Introduction.

On November 4, 1980, the Solicitor issued M-36926, "Application of the Endangered
Species Act to Native Americans with Treaty Hunting and Fishing Rights" ("Sol. Op. M-
36926").[1]  Sol. Op. M-36926 concluded that

> Indian treaty rights do not extend to the taking of threatened or endangered
> species and that even if treaty rights allow the taking of endangered and
> threatened species, then those rights may have been abrogated or modified
> by Congress through the [Endangered Species Act].[2]

On June 18, 2018,[3] federal prosecutors charged a member of the Seminole Tribe of Florida
("Tribe") and resident of the Brighton Seminole Indian Reservation with violating the
Endangered Species Act ("ESA")[4] and Lacey Act.[5]  In response to the defendant's motion to
dismiss on the grounds that his hunting activities were protected by treaty, the United States
argued that Congress had abrogated any applicable reserved hunting right[6] through enactment of
the ESA.[7]  In support of this proposition, the United States cited to Sol. Op. M-36926 and

---

[1] Clyde O. Martz, Solicitor Opinion M-36926, "Application of the Endangered Species Act to Native Americans
with Treaty Hunting and Fishing Rights" (Nov. 4, 1980) [hereinafter "Sol. Op. M-36926"].
[2] Sol. Op. M-36926 at 1.
[3] Complaint, *United States v. Turtle*, 365 F. Supp. 3d 1242 (M.D. Fla. 2019) (Case No: 2:18-cr-88-FtM-38MRM).
[4] Pub. L. No. 93-205, 87 Stat. 884 (codified as amended at 16 U.S.C. § 1531 *et seq.*).
[5] Act of May 25, 1900, ch. 553, 31 Stat. 187 (codified as amended at 16 U.S.C. § 3371 *et seq.*).  Among other things,
the Lacey Act prohibits the "import, export, transport, s[ale], recei[pt], acqui[sition], or purchase [of] any fish or
wildlife or plant taken, possessed, transported, or sold in violation of any" federal or tribal law, or state or foreign
law when the activity is in interstate of foreign commerce.  16 U.S.C. § 3372(a).  In the case at issue, the Lacey Act
violation was predicated on the ESA.  The State of Florida similarly criminalizes the activity for which the
defendant was charged.  FLA. STAT. § 379.409(1) (2012).
[6] The analysis contained in Sol. Op. M-36926 applies equally to "any hunting or fishing rights pursuant to a treaty
with the United States or pursuant to a statutory or aboriginal right, or an executive order."  Sol. Op. M-36926 at 2.
As such, unless the context otherwise requires, this memorandum will refer to these rights generally as "reserved."
[7] Government Response to Motion Dismiss at 7-17, *United States v. Turtle*, 365 F. Supp. 3d 1242 (M.D. Fla. 2019)
(Case No: 2:18-cr-88-FtM-38MRM).

Solicitor Opinion M-36936 ("Sol. Op. M-36936"),[8] an opinion from the same period that reached a similar result with respect to the Migratory Bird Treaty Act ("MBTA").[9] The U.S. District Court for the Middle District of Florida rejected the government's position relating to abrogation,[10] but nonetheless found the ESA to be enforceable against members of federally-recognized Indian tribes ("Indians" or "tribal members"). In dismissing the defendant's affirmative defense of reserved hunting rights, the federal district court judge relied, in part, on the reasoning contained in Sol. Op. M-36926.[11]

It is the considered view of the signatories to this memorandum that Sol. Op. M-36926 and Sol. Op. M-36936 ("Opinions") are inconsistent with subsequent case law. Shortly after their publication, the U.S. Supreme Court ("Supreme Court") heard arguments in *United States v. Dion*.[12] There, in a unanimous opinion, Associate Justice Thurgood Marshall recounted the varying standards that the Supreme Court historically applied when considering whether Congress had intended to abrogate a treaty or treaty right.[13] He then concluded that "[w]hat is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty."[14]

As discussed in greater detail below, neither the statutory text nor legislative history of the ESA or MBTA demonstrate congressional intent to abrogate reserved hunting or fishing rights. Accordingly, we recommend that both Sol. Op. M-36926 and Sol. Op. M-36936 be withdrawn to the extent they conflict with *Dion* and related case law. We similarly recommend the withdrawal of Solicitor Opinion M-27690 ("Sol. Op. M-27690"),[15] an earlier analysis of the MBTA that reaches a conclusion similar to that of Sol. Op. M-36936. These withdrawals do not necessarily make the ESA or MBTA inapplicable in Indian Country.[16] Rescinding such opinions will, however, prevent federal prosecutors and judges from citing to legal opinions that the Department of the Interior ("Department") no longer considers to be accurately reflective of the law.

## II.  Legal Background.

### A.  Abrogation of reserved hunting and fishing rights.

"As a general rule, Indians enjoy exclusive treaty rights to hunt and fish on lands reserved to them, unless such rights were clearly relinquished by treaty or have been modified by

---

[8] William H. Coldiron, Solicitor Opinion M-36936, "Application of Eagle Protection and Migratory Bird Treaty Acts to Reserved Indian Hunting Rights" (June 15, 1981) [hereinafter "Sol. Op. M-36936"].

[9] Act of July 3, 1918, ch. 128, 40 Stat. 755 (codified as amended at 16 U.S.C. §§ 703-712).

[10] *United States v. Turtle*, 365 F. Supp. 3d 1242, 1248 (M.D. Fla. 2019) ("All in all, interpreting the ESA liberally in favor of the Seminoles, the Court does not find clear and convincing evidence that Congress chose to abrogate the Tribe's usufructuary rights.").

[11] *Id.* at 1248-49.

[12] 476 U.S. 734 (1986).

[13] *Id.* at 738-39.

[14] *Id.* at 739-40.

[15] Charles Fahy, Solicitor Opinion M-27690, "Migratory Bird Treaty Act" (Jun. 15, 1934) [hereinafter "Sol. Op. M-27690"].

[16] "Indian country" is a term of art defined at 18 U.S.C. § 1151. It includes reservations, trust lands, Indian allotments, and dependent Indian communities.

3

Congress."[17] And where Congress so chooses to abrogate Indian treaty rights, "it must clearly express its intent to do so."[18] For example, even where Congress has terminated a tribe or disestablished an Indian reservation, treaty rights survive absent clear congressional intent to the contrary.[19] As the Supreme Court recently held in *Herrera v. Wyoming*, a statute cannot be interpreted as abrogating a treaty right when "[t]here simply is no evidence that Congress intended to abrogate the … Treaty right … much less the 'clear evidence' this Court's precedent requires."[20]

*United States v. Dion* is a foundational case concerning the application of these principles.[21] In *Dion*, the Supreme Court considered whether Congress had abrogated any reserved right to hunt bald and golden eagles when it passed the Bald and Golden Eagle Protection Act ("BGEPA").[22] The Supreme Court began its inquiry by stating that "Congress' intention to abrogate Indian treaty rights [must] be clear and plain" and by invoking the canon discussed *supra* that "[a]bsent explicit statutory language, [courts] have been extremely reluctant to find congressional abrogation of treaty rights."[23] Considering this framework as settled law,[24] the Supreme Court sought to reconcile the various approaches that had previously been applied for "determining how [Congress'] clear and plain intent must be demonstrated."[25]

The Supreme Court found that while an explicit statement by Congress is "preferable for the purpose of ensuring legislative accountability for the abrogation of treaty rights … such an intent can also be found by a reviewing court from clear and reliable evidence in the legislative history of a statute."[26] As summarized above, such an inquiry requires "clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty."[27] The Supreme Court ultimately applied these principles to find clear congressional intent in BGEPA's text and legislative history to abrogate tribal treaty rights.[28] Subsequent Supreme Court and lower court cases examining congressional abrogation of reserved hunting and fishing rights

---

[17] *Dion*, 476 U.S. at 738.

[18] *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202–03 (1999) (collecting cases).

[19] *See, e.g.*, *Menominee Tribe v. United States*, 391 U.S. 404 (1968) (tribal treaty hunting right survived termination of tribe); *Lower Brule Sioux Tribe v. South Dakota*, 711 F.2d 809 (8th Cir. 1983) (general statutory language referring to taking "entire interest" in certain lands falls short of abrogating specific treaty right); *Kimball v. Callahan*, 493 F.2d 564, 567 (9th Cir. 1974) (tribal termination statute did not extinguish tribal hunting and fishing rights).

[20] 139 S. Ct. 1686, 1698–99 (2019) (quoting *Mille Lacs*, 526 U.S. at 203).

[21] While there are cases concerning abrogation that predate *Dion* (e.g., *Menominee*), most courts today refer to *Dion* when citing to the Supreme Court's congressional abrogation analysis. For ease of reference, this memorandum will refer to such analysis as the "*Dion*" analysis.

[22] Act of June 8, 1940, ch. 278, 54 Stat. 250 (codified as amended at 16 U.S.C. § 668).

[23] *Dion*, 476 U.S. at 738-39 (quoting *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 690 (1979)).

[24] *Id.* (citing, *e.g.*, *Menominee*, 391 U.S. at 412; *United States v. Santa Fe Pac. R. Co.*, 314 U.S. 339, 353 (1941); *Pigeon River Co. v. Cox Ltd.*, 291 U.S. 138, 160 (1934)).

[25] *Id.* at 739.

[26] *Id.*

[27] *Id.* at 740.

[28] *Id.* at 745; *see also generally id.* at 740-45. The Supreme Court declined to decide whether the ESA or the MBTA similarly abrogated tribal treaty rights, or whether hunting a species "to extinction" fell outside the scope of the treaty right. It did, however, hold that BGEPA's abrogation of treaty rights to hunt eagles precluded defendants from citing those treaty rights as a defense to a separate ESA prosecution for the same activities. *Id* at 738 n.5, 745-46.

4

follow *Dion*'s "clear congressional intent" analysis.[29]  These cases considered federal conservation statutes such as the ESA,[30] the Lacey Act,[31] the MBTA,[32] and others.[33]

## B. The *Puyallup* "conservation necessity" test.

In both Opinions, the Solicitor found the ESA and the MBTA to be broadly applicable by concluding, in part, that reserved hunting and fishing rights inherently do not extend to the taking of threatened or endangered species.[34]  The Solicitor in each case based his conclusions on his interpretation of a series of Supreme Court opinions holding that the State of Washington could regulate certain Indian tribes' treaty fishing activities so long as such regulations were both (1) reasonable and necessary for conservation and (2) non-discriminatory towards Indians.[35]  Finding that the "conservation necessity" test articulated in *Puyallup* applies equally to federal statutes, the Solicitor concluded that the ESA and the MBTA apply to Indian tribes as reasonable, non-discriminatory conservation statutes, irrespective of whether their texts or legislative histories demonstrate the requisite congressional intent.[36]

Several courts have considered whether *Puyallup* applies to federal conservation regulations, such that a federal statute satisfying *Puyallup* may equally restrict tribal hunting and fishing, even if it would otherwise fail *Dion*.  Courts have split on this question, with certain cases applying variations of the test articulated in *Puyallup* at the federal level[37] and others explicitly holding that *Puyallup* is limited to state regulation.[38]  In briefs submitted in *Dion*, the

___

[29] *See, e.g.*, *Mille Lacs*, *supra*; *South Dakota v. Bourland*, 508 U.S. 679 (1993).

[30] *See, e.g.*, *United States v. Dion*, 752 F.2d 1261, 1269 (8th Cir. 1985) (en banc), *overruled on other grounds*, 476 U.S. 734; *Turtle*, 365 F. Supp. 3d at 1242; *United States v. Billie*, 667 F. Supp. 1485 (S.D. Fla. 1987).

[31] *United States v. Brown*, No. CRIM. 13-68 JRT/LIB, 2013 WL 6175202, at *4 (D. Minn. Nov. 25, 2013), *aff'd*, 777 F.3d 1025 (8th Cir. 2015).

[32] *See, e.g.*, *United States v. Tawahongva*, 456 F. Supp. 2d 1120, 1126 n.11 (D. Ariz. 2006) (collecting cases applying *Dion* to treaty rights); *United States v. Bresette*, 761 F. Supp. 658, 661 (D. Minn. 1991); *United States v. Cutler*, 37 F. Supp. 724, 725 (D. Idaho 1941); *United States v. Vance Crooked Arm*, No. CR-13-18-BLG-RFC, 2013 WL 1869113, at *2 (D. Mont. May 3, 2013); *United States v. Fiddler*, No. 2:10-CR-00052-RLH, 2011 WL 2149510, at *1 (D. Nev. Mar. 11, 2011), *report and recommendation adopted*, No. 2:10-CR-00052-RLH, 2011 WL 2148853 (D. Nev. June 1, 2011); *United States v. Wahchumwah*, No. CR-09-2035-EFS-1, 2009 WL 2604779, at *1 (E.D. Wash. Aug. 24, 2009); Amended Order Ruling on Pretrial Motions, *United States v. Hawk*, No. CR-09-2034-EFS-1, at 7-13 (E.D. Wash. Aug. 13, 2009) (unpublished order on file with the Department) [hereinafter "*Hawk*"].

[33] *See, e.g.*, *United States v. White*, 508 F.2d 453, 458–59 (8th Cir. 1974) (pre-*Dion* Eagle Act case); *United States v. Allard*, 397 F. Supp. 429, 431 (D. Mont. 1975) (same); *Tribes v. United States*, No. 96-381-HA, 1996 WL 924509, at *9 (D. Or. Oct. 2, 1996) (Emergency Supplemental Appropriations for Disaster Relief and Recessions Act).

[34] *See* Sol. Op. M-36926 at 528-29; Sol. Op. M-36936 at 588-90.

[35] *Puyallup Tribe v. Dep't of Game of Wash.*, 433 U.S. 165 (1977) (*Puyallup III*); *Dep't of Game of Wash. v. Puyallup Tribe*, 414 U.S. 44 (1973) (*Puyallup II*); *Puyallup Tribe v. Dep't of Game of Wash.*, 391 U.S. 392 (1968) (*Puyallup I*) (collectively "*Puyallup*").

[36] Sol. Op. M-36926 at 528-29; Sol. Op. M-36936 at 588-90.

[37] *See, e.g.*, *Anderson v. Evans*, 371 F.3d 475, 497, 497 nn.21-22 (9th Cir. 2004); *United States v. Fryberg*, 622 F.2d 1010, 1013-16 (9th Cir. 1980), *cert. denied*, 449 U.S. 1004 (1980); *Turtle*, 365 F. Supp. 3d at 1247-48; *United States v. Gotchnik*, 57 F. Supp. 2d 798, 802-04 (D. Minn. 1999).

[38] *See, e.g.*, *Fiddler*, 2011 WL 2149510, at *2-3 ("Accordingly, inasmuch as *Dion* is directly on point, and absent any explanation in [*Fryberg* and *Anderson*] for not applying precedential Congressional treaty abrogation analysis, this court will heed the admonition that treaties are not to be easily cast aside, and apply the Supreme Court's precedential abrogation analysis in this case.") (citation and internal quotations omitted); *Hawk* at 12 (rejecting *Fryberg* and *Anderson* on the grounds that they "ignor[ed] post-*Dion* Supreme Court precedent directly on point which utilized the Congressional treaty abrogation analysis").

United States took the position that *Puyallup* can be applied to federal statutes, though the Supreme Court ultimately did not address the issue.[39]

As the purpose of this memorandum is to consider whether the ESA and the MBTA abrogate reserved rights within the meaning of *Dion*, we do not address *Puyallup* and its application to federal statutes. Thus, it remains the position of the United States that the ESA is enforceable against tribes and tribal members. Nevertheless, we have raised this issue to emphasize that it is settled law that the States have the ability to regulate reserved hunting and fishing, consistent with the conservation necessity test articulated in *Puyallup*.

### III.   Analysis.

#### A.  The ESA did not abrogate reserved hunting and fishing rights.

In Sol. Op. M-36926, the Solicitor declined to explicitly address whether the ESA abrogated reserved hunting and fishing rights.[40]  And while the Supreme Court in *Dion* held that BGEPA's abrogation of treaty rights precluded the respondent from asserting such rights as a defense to alleged violations of the ESA, it expressly did not decide whether the ESA independently abrogated those rights.[41]  Indeed, that portion of the en banc opinion of the federal circuit court from which certiorari was granted was not disrupted, leaving intact its analysis that Congress did not intend the ESA to abrogate tribal treaty rights.[42]

Ultimately, when enacting a federal statute, Congress must demonstrate a "clear and plain intent" to abrogate tribal treaty rights.[43]  "What is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty."[44]  Particularly where treaty rights are implicated, courts must further construe statutes "liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."[45]  The ESA's plain language or legislative history must therefore demonstrate clear congressional intent to abrogate reserved hunting and fishing rights, as read most favorably for tribal interests.

##### 1.  The plain language of the ESA does not demonstrate clear congressional intent to abrogate reserved hunting and fishing rights.

As the *Dion* Court noted, "[t]he Endangered Species Act and its legislative history … are to a great extent silent regarding Indian hunting rights."[46]  However, there are two statutory provisions in the ESA that are potentially relevant to this inquiry.  The ESA's prohibited acts

---

[39] *See* Brief for the United States at 18-33, *United States v. Dion*, 476 U.S. 734 (1986) (No. 85-246) [hereinafter "Brief for the United States"]; Reply Brief for the United States at 6 n.4, *United States v. Dion*, 476 U.S. 734 (1986) (No. 85-246); *see also* Government's Response to Motion to Dismiss at 17-20, *United States v. Turtle*, 365 F. Supp. 3d 1242 (M.D. Fla. 2019) (No. 2:18-cr-88-FtM-38MRM) (arguing the same).

[40] Sol. Op. M-36926 at 534-35.

[41] 476 U.S. at 745-46.

[42] 752 F.2d 1261, 1270 (8th Cir. 1985) (en banc); 476 U.S. at 736, 745.

[43] 476 U.S. at 739.

[44] *Id.* at 739-40.

[45] *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985).

[46] 476 U.S. at 745.

Case 6:24-cv-00027-BMM-KLD   Document 4-1   Filed 04/29/24   Page 18 of 28

cover "any person subject to the jurisdiction of the United States."[47] The term "person" is separately defined as:

> [A]n individual, corporation, partnership, trust, association, or any other private entity; or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State, municipality, or political subdivision of a State, or of any foreign government; any State, municipality, or political subdivision of a State; or any other entity subject to the jurisdiction of the United States.[48]

This definition makes no specific mention of Indians or Indian tribes. However, under a plain language statutory interpretation, the term "individual" is read to include Indians, and "other entit[ies] subject to the jurisdiction of the United States" is read to include recognized Indian tribes. One could argue, therefore, that in applying the ESA's prohibitions in a broad, nondiscriminatory manner to any person subject to the jurisdiction of the United States, including Indians and Indian tribes, the plain language of the ESA thereby also demonstrated congressional intent to abrogate treaty hunting and fishing rights where such activities are otherwise prohibited by the ESA subject to narrow exclusions.

While we find this definition is not the clear expression of congressional intent contemplated in *Dion* or other abrogation analyses in relation to reserved tribal hunting and fishing rights, this plain language interpretation is not without support. The ESA includes a narrow exclusion for the taking of threatened and endangered species by "any Indian, Aleut, or Eskimo who is an Alaskan Native who resides in Alaska; or any non-native permanent resident of an Alaskan native village" if such taking is primarily for subsistence purposes.[49] In conjunction with the broad definition of a covered "person," this language could be read to suggest that Congress intended the ESA to apply to any otherwise prohibited activity undertaken by an individual Indian other than those specifically mentioned in the Alaska exception, including treaty hunting and fishing activities. Further support for this interpretation can be gleaned from the Supreme Court's decision in *Tennessee Valley Authority v. Hill*.[50] There, the Supreme Court noted that when passing the ESA, "Congress was also aware of certain instances in which exceptions to the statute's broad sweep would be necessary."[51] The Supreme Court accordingly refused to read any exceptions into the ESA other than those specifically enumerated in the statute.[52]

Similarly, in *United States v. Billie*, a case concerning whether the ESA applied to noncommercial hunting of the Florida panther by a member of the Seminole Tribe of Florida on the Big Cypress Indian Reservation, the U.S. District Court for the Southern District of Florida ("District Court") read these exceptions in concert as sufficient under *Dion* to demonstrate congressional intent to abrogate treaty hunting rights. The District Court held that (1) the ESA is a statute of general applicability that does not otherwise exclude Indians; and (2) the narrow exclusion for Alaska Native subsistence demonstrates that Congress considered Indians in the

---

[47] 16 U.S.C. § 1538(a)(1).
[48] 16 U.S.C. § 1532(13).
[49] 16 U.S.C. § 1539(e)(1).
[50] 437 U.S. 153 (1978).
[51] *Id.* at 188.
[52] *Ibid.*

conterminous United States when passing the ESA, and intended the ESA to apply to tribal hunting and fishing activities so located.[53]

Other courts have disagreed with regard to whether the ESA abrogates treaty hunting and fishing rights. For example, before *Dion* reached the Supreme Court, the Eighth Circuit noted that "[w]e cannot find an express reference to Indian treaty hunting rights showing congressional intent to abrogate or modify such rights in either the statutory language or legislative history of this Act. Nor has the government directed our attention to any such reference."[54] And in *Turtle*, the federal district court noted that Congress may have "limited this exception to Alaskan natives in recognition of their unique reliance on endangered species for cultural and subsistence purposes … [or] believed Alaskan natives had a unique need for an exception because they lacked the treaty rights enjoyed by Indians in other states."[55]

Confronted with competing federal court decisions, we conclude, on balance, that the plain language of the ESA does not meet the high threshold necessary to demonstrate congressional intent to abrogate reserved hunting and fishing rights. First, that the ESA defines "person" without specifically identifying or exempting Indians does not require its application to Indians exercising reserved hunting and fishing rights. We are mindful of the interpretive canon that statutes of general applicability apply to Indians absent evidence to the contrary.[56] But as *Dion* and its progeny demand, the relevant interpretive canon and analysis required is different in the specific context of determining congressional abrogation of reserved rights.[57] Here, the issue is whether Congress considered the effect of the ESA on reserved hunting and fishing rights, then demonstrated a clear intent to abrogate those rights. We do not glean such intent from the fact that the ESA's general definition of "person" makes no specific mention of Indians or Indian tribes.

Nor does the Alaska subsistence exemption provide the prerequisite congressional intent. It is certainly possible to interpret this provision as suggesting the ESA is otherwise applicable to Indians, as the District Court did in *Billie*. But it is equally plausible, as was observed in *Turtle*, that the provision was meant to extend to Alaska Natives similar hunting and fishing rights to what legislators understood were available to those Indians residing in Indian Country in the conterminous United States. For example, during congressional hearings prior to the passage of the ESA, the Department provided testimony in support of the Alaska exception:

> Although American Indians enjoy treaty-secured hunting and fishing rights over areas in which endangered species are found, no such rights are recognized for Aleuts and Eskimos. Moreover, section 3 of the Alaska

---

[53] 667 F. Supp. at 1490; *accord id.* at 1491 (finding plain-language abrogation from "[t]he narrow Alaskan exception, the inclusion of Indians within the Act's definition of 'person,' [and] the Act's general comprehensiveness").

[54] 752 F.2d at 1269.

[55] 365 F. Supp. 3d at 1248.

[56] *See, e.g.*, *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 115-24 (1960).

[57] *See, e.g.*, *United States v. Fox*, 573 F.3d 1050, 1052 (10th Cir. 2009) (otherwise applicable laws of general application do not apply to Indians if they "abrogate rights guaranteed by Indian treaties" pursuant to *Dion*).

8

Native Claims Act extinguished any claims they may have asserted to immunity from Federal hunting and fishing laws.[58]

When viewed in this manner, the Alaska exception represents a decision by Congress to exempt Alaska Natives who lack treaty hunting and fishing rights from the ESA. It does not reflect, *sub silentio*, a specific consideration and extinguishment of the rights of treaty Indians in the conterminous United States.[59]

BGEPA provides an instructive comparison. While it generally prohibited the taking, possession, or transportation of bald and golden eagles, Congress authorized the Secretary of the Interior ("Secretary") to permit such actions "for the religious purposes of Indian tribes" in certain limited contexts.[60] As the Supreme Court found in *Dion*, that authorization "is difficult to explain except as a reflection of an understanding that the statute otherwise bans the taking of eagles by Indians."[61] Unlike the BGEPA permit clause, however, the ESA's Alaska exception applies only to Alaska Natives and residents of Alaska Native villages in Alaska. It says nothing of the rights of Indians residing in the conterminous United States. As several courts have found, and as the United States has argued, clauses in federal conservation statutes specific to the rights of Alaska Natives are generally not probative in a *Dion* analysis.[62]

Similarly, the Supreme Court in *Tennessee Valley Authority* considered the general question of how to apply the ESA outside of its enumerated exemptions. But there is a significant distinction between an otherwise-covered entity (i.e., a federal agency) that cannot avail itself of the ESA's limited statutory exemptions and an Indian tribe that is exempt from federal conservation statutes absent clear congressional intent to abrogate its treaty-protected rights. It may therefore be simultaneously true that the ESA is to be broadly applied, but that it does not contain the textual hallmarks to extend to reserved hunting and fishing activities.

Whatever views the Department had prior to passage of the ESA in 1973, at a 1985 congressional hearing on the interplay between endangered species and American Indian religious practices, the Acting Solicitor testified that while the ESA did not amount to a

---

[58] *Predatory Mammals and Endangered Species: Hearings Before the Subcomm. on Fisheries and Wildlife Conservation of the Comm. on Merchant Marine and Fisheries*, 92d Cong., 2d Sess. 144 (1972) [hereinafter "*Predatory Mammals*"].

[59] *See United States v. Nuesca*, 945 F.2d 254, 257–58 (9th Cir. 1991) (noting that the Alaska exception "is based upon food supply and culture. Some native Alaskans depend upon hunting certain species for their livelihood; hunting is engrained in their culture" and rejecting notion that in Alaska exception, Congress was "called upon to decide whether any surviving native Hawaiians subsist on the hunting of endangered animals").

[60] 16 U.S.C. § 668a.

[61] 476 U.S. at 740.

[62] *See, e.g.*, *Bresette*, 761 F. Supp. at 663 (characterizing the MBTA exemption for Alaska Natives as "irrelevant for purposes of *treaty* rights analysis because Native Alaskans do *not* have treaty rights. . . . To treat the consideration of indigenous Alaskans' rights as the consideration of Native American *treaty* rights nationwide, for the simple reason that both groups are regarded as Indians, is disingenuous") (emphasis in original); *Fiddler*, 2011 WL 2149510 at *5 ("While the MBTA does make reference to Native Alaskans, specifically allowing indigenous inhabitants of the State of Alaska to take and collect migratory birds for food and clothing, this is irrelevant for the purposes of treaty rights because Native Alaskans do not *have* treaty rights.") (emphasis in original; citations and internal quotations omitted); Supplemental Answering Brief for the Federal Defendants, *Anderson v. Evans* at 19, 371 F.3d 475 (9th Cir. 2004) (No. 02-35761)) (Marine Mammal Protection Act provision authorizing Alaska Native subsistence taking "is irrelevant to the question of Indian *treaty* rights because Alaskan natives have no such treaty rights and thus required an express statutory exception to continue their subsistence taking") (emphasis in original).

wholesale abrogation of tribal hunting and fishing rights, Congress nevertheless intended the ESA to apply to such rights.[63] The Department maintained this position even as it recognized the ambiguity surrounding the ESA's definition of "person."[64] In light of the abrogation test ultimately set forth in *Dion*, however, that view is no longer persuasive. The relevant inquiry is whether and to what extent there was specific consideration of treaties or other congressional or executive action establishing reserved rights, not simply the general scope of the statute. We conclude that the plain language of the ESA does not satisfy *Dion*'s abrogation test.

### 2. The ESA's legislative history is equivocal with regard to congressional intent to abrogate tribal reserved rights.

The ESA's legislative history is ambiguous regarding abrogation.[65] Unenacted predecessor versions of the ESA suggest that Congress may have "intended to subject Indians to its prohibitions."[66] In 1972, for example, Congress considered two bills similar to the ESA, both of which contained broader exemptions regarding the taking of protected species for Indian religious purposes pursuant to a treaty, executive order, or statute.[67] During deliberations on these bills, Department officials objected to Congress' proposed deletion of exceptions "for [the] consumption and ritual use by American Indians, Aleuts or Eskimos,"[68] and remarked that in taking such action, certain members of the relevant Senate subcommittee appeared intent on "prohibit[ing] American Indians from continuing [reserved] hunting and fishing" of species covered by the ESA.[69]

In reviewing this legislative history, the District Court in *Billie* found that "Congress must have known that the limited Alaskan exemption would be interpreted to show congressional intent not to exempt other Indians."[70] Certain scholars have lent support to this view, and have concluded that "in view of the legislative history and the plain language of the ESA, it can hardly be said that Congress failed to consider the conflict between endangered species and Indian treaty rights…. The evidence is conclusive that Congress considered Indian treaty rights and chose to abrogate those rights in passing the ESA."[71]

---

[63] Endangered Species Act Reauthorization, 1985: Hearings on H.R. 1027 Before the Subcomm. on Fisheries and Wildlife Conservation and the Env't of the House Comm. on Merchant Marine and Fisheries, 99th Cong. 312, 313 (1985) [hereinafter ESA Reauthorization] (statement of Marian Horn, Acting Solicitor, Dep't of the Interior).

[64] *Id.* at 314.

[65] *See* George Cameron Coggins & William Modrcin, *Native American Indians and Federal Wildlife Law*, 31 STAN. L. REV. 375, 378 (1979) (explaining that, in the area of wildlife regulation, "Congress was either silent or ambiguous in debate and statutory language, [so] the search for legislative intent has been quixotic, with inconclusive results").

[66] *Billie*, 667 F. Supp. at 1490.

[67] H. REP. NO. 92-13081 (1972); S. REP. NO. 92-3199 (1972).

[68] *Endangered Species Conservation Act of 1972: Hearings on S. 249, S.3199, & S.3818 before the Subcomm. on the Env't of the Senate Comm. on Commerce*, 2d Cong., 2d Sess. 71 (1972).

[69] *See generally Predatory Mammals, supra* note 58.

[70] *Billie*, 667 F. Supp. at 1490-91. A Florida State court came to a similar conclusion when trying Mr. Billie under State law. *State v. Billie*, 497 So. 2d 889, 893-94 (Fla. Dist. Ct. App. 1986).

[71] Conrad A. Fjetland, *The Endangered Species Act and Indian Treaty Rights: A Fresh Look*, 13 TUL. ENVTL. L.J. 45, 59-60 (1999). *But cf., e.g.*, Tracy A. Diekemper, *Abrogating Treaty Rights Under the* Dion *Test: Upholding Traditional Notions that Indian Treaties Are the Supreme Law of the Land*, 10 J. ENVTL. L. & LITIG. 473, 482 (1995); Sally J. Johnson, *Honoring Treaty Rights and Conserving Endangered Species After United States v. Dion*, 13 PUB. LAND L. REV. 179, 186-88 (1992).

Relying on the same facts, however, both the Eighth Circuit in *Dion* and the federal district court in *Turtle* arrived at the opposite conclusion. In *Dion*, the Eighth Circuit held that it could not "find an express reference to Indian treaty hunting rights showing congressional intent to abrogate or modify such rights in either the statutory language or legislative history of [the ESA]."[72] The *Dion* en banc panel rejected the unenacted 1972 bills as an impermissible "'backhanded' way of abrogating treaty hunting rights of Indians," reasoning that the "[f]ailure to pass a bill creating a specific exception for American Indians does not show that Congress expressly intended that the Act would abrogate Indian treaty hunting rights."[73] Rather, the Eighth Circuit in *Dion* found more plausible explanations for Congress' rejection of those bills, "not the least of which is the possibility that Congress concluded that American Indians are not subject to the Act to the extent they are acting within the purview of a treaty, and that greater protection from the Act was not necessary."[74] Given the opportunity to address this issue, the Supreme Court in *Dion* neither affirmed nor reversed this specific Eighth Circuit finding.[75] The federal district court in *Turtle* similarly found the 1972 deliberations to be equivocal, noting that the Department at one point argued during the same hearings that Indians "enjoy treaty-secured hunting and fishing rights" and that Congress needed to expressly extinguish those rights if that was its ultimate intention.[76]

Apart from the discussions surrounding the ESA's predicate bills, there is little else in the legislative record regarding congressional intent toward Indians prior to the statute's enactment. In the period preceding reauthorization, however, there is at least some evidence that Congress understood the "person or entity" clause to be expansive.[77] In 1985, for example, Representative John Breaux of Louisiana stated that:

> The law of this country is that it is illegal to take an endangered species, period. That is a declaration of the Congress of the United States, that if a species is found, by biological evidence, that it is such a delicate situation that it is threatened with the danger of becoming extinct, any taking of that species is illegal. That has already been determined.[78]

And in 1987, Representative Douglas H. Bosco of California more pointedly stated that:

> There are a small number of Native Americans in the country who have claimed, under right of treaty or other rights, that the Endangered Species Act does not apply to them…. I want to make it clear that Congress has always intended that there are not two classes of Americans, one entitled to take endangered species and another obligated to protect them. The court system, fortunately, has gone along with this…. I believe without

---

[72] *Dion*, 752 F.2d at 1269.
[73] *Id.*
[74] *Id.* at 1270.
[75] 476 U.S. at 736, 745.
[76] 365 F. Supp. 3d at 1248 (citing *Predatory Mammals, supra* note 58, at 144); *see also* Coggins at 404 (noting the Department's suggestion during the 1972 hearings that Congress include an express prohibition on the exercise of treaty-secured rights if that was its intent, and arguing that Congress' subsequent failure to do so undercuts the implication that the ESA overrides treaty rights).
[77] H.R. REP. NO. 93-412, at 1-4, 10, 15-17 (1973).
[78] ESA Reauthorization at 413 (statement of Rep. John Breaux).

11

> exception, that the Endangered Species Act clearly applies to all Americans.[79]

Whatever the accuracy of either of these comments, we note that the Supreme Court "normally gives little weight to statements, such as those of the individual legislators, made *after* the bill in question has become law."[80]

In light of the above, we conclude that the ESA's legislative history is ambiguous and lacks the hallmarks of the requisite specificity to support an abrogation of treaty rights. Again, BGEPA provides an instructive comparison. When Congress was considering amendments to BGEPA in the early 1960s, the Secretary requested that the final bill include a Departmental permit process through which Indians could obtain eagle feathers for religious purposes.[81]  The House of Representatives accepted the Secretary's request, while nonetheless communicating its view that Indian eagle take was a significant factor in the species' decline.[82]  The Senate heard and reported similar testimony and passed the bill with the permit process included.[83]  As the Supreme Court noted in *Dion*, this resolution reflected both Congress' express recognition of the need to regulate Indian hunting to effectuate the purposes of BGEPA, and its intention to "set in place a regime in which the Secretary of the Interior had control over Indian hunting, rather than one in which Indian on-reservation hunting was unrestricted." That regime was accomplished through the "specific, narrow exception that delineated the extent to which Indians would be permitted to hunt the bald and golden eagle."[84]

Further, while it is true that the ESA's two unenacted predicate bills included the specific exemptions for Indians in the conterminous United States that would signal abrogation, we do not view as determinative the fact that that draft language was omitted from the ESA. We recognize, however, that this conclusion contrasts with the position of the United States in its 1986 brief before the Supreme Court in *Dion*. There, the United States argued that Congress' rejection of the language included in these earlier bills reflected an intent to abrogate treaty hunting and fishing rights.[85]  Specifically, the United States asserted that the narrow exemption for Alaska Natives in the ESA, as enacted, was a considered replacement or substitution for the broader Indian exemptions appearing in the two predicate bills.[86]

---

[79] H.R. REP. NO. 93-412, at 10 ("'Person' is defined broadly enough to cover any person or entity, including employees of state or Federal agencies.").

[80] *Barber v. Thomas*, 560 U.S. 474, 486 (2010) (emphasis in original); *accord Veasey v. Abbott*, 830 F.3d 216, 234 (5th Cir. 2016) ("The district court also placed inappropriate reliance upon the type of post-enactment testimony which courts routinely disregard as unreliable."); *Schrader v. Idaho Dep't of Health & Welfare*, 768 F.2d 1107, 1114 (9th Cir. 1985) ("It is well settled that the views of a later Congress regarding the legislative intent of a previous Congress do not deserve much weight. Courts avoid deducing the intent behind one act of Congress from the implication of a second act passed years later.") (citations omitted); *N.C. Freed Co. v. Bd. of Governors of Fed. Reserve Sys.*, 473 F.2d 1210, 1217 n.23 (2d Cir. 1973) (statements concerning congressional intent made after the passage of a bill "do[] not constitute part of legislative history and is entitled to no weight" by a court).

[81] *Miscellaneous Fish and Wildlife Legislation: Hearings before the Subcommittee on Fisheries and Wildlife Conservation of the House Committee on Merchant Marine and Fisheries*, 87th Cong., 2d Sess., 1 (1962).

[82] H.R. REP. NO. 87-1450, at 2-7 (1962).

[83] *Protection for the Golden Eagle: Hearings before a Subcomm. of the Senate Comm. on Commerce*, 87th Cong., 2d Sess., 23 (1962); S. REP. NO. 87-1986, at 5-7 (1962).

[84] 476 U.S. at 743-44.

[85] Brief for the United States at 28.

[86] *Id.* at 30–31.

With due respect to our colleagues at the Department of Justice, we view this discussion as having relatively little persuasive force. Courts have expressed skepticism as to the probative value of unenacted legislation as a barometer of congressional intent, noting "the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough."[87] This is particularly true when set against the abrogation analysis ultimately set forth in *Dion* and what we believe to be the persuasive views of subsequent courts concerning the relevance of the Alaska Native exemption to the rights of Indians in the conterminous United States.

Accordingly, we conclude that neither the plain language nor the legislative history of the ESA provides the clarity of congressional intent necessary to abrogate reserved hunting and fishing rights. We recommend withdrawing Sol. Op. M-36926, "Application of the Endangered Species Act to Native Americans with Treaty Hunting and Fishing Rights."

### B. The MBTA did not abrogate reserved hunting rights.

In contrast to the limited authority examining the applicability of the ESA to tribal treaty rights, many courts have considered whether the MBTA is applicable to tribes. The majority of these cases arise in the context of tribal members arguing that the MBTA violates their free exercise of religion to the extent that possession of federally-protected birds is necessary for religious use.[88] The comparatively fewer cases applying *Dion* to the MBTA generally agree that the statute does not abrogate reserved hunting rights.

#### 1. The plain language of the MBTA does not demonstrate clear congressional intent to abrogate reserved hunting rights.

In relevant part, the MBTA makes it unlawful "to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import … any migratory bird, any part, or any product … of any such bird" included in the terms of certain migratory bird protection treaties between the United States and the United Kingdom (on behalf of Canada), Mexico, Japan, and Russia.[89] The MBTA does not have a definitions section setting out covered entities; with one relevant exception (discussed below), is simply drafted as a statute of general applicability. As

---

[87] *United States v. Eaton*, 352 F.3d 286, 314 (6th Cir. 2003); *accord Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance . . . from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (quoting *Trailmobile Co. v. Whirls*, 331 U.S. 40, 61 (1947)); *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 306 (1988) ("This Court generally is reluctant to draw inferences from Congress' failure to act.") (citations omitted).

[88] *See, e.g.*, *United States v. Hardman*, 297 F.3d 1116 (10th Cir. 2002); *United States v. Abeyta*, 632 F. Supp. 1301 (D.N.M. 1986).

[89] 16 U.S.C. § 703; *see also* Sol. Op. M-36936 at 589-90. These treaties are the Convention for the Protection of Migratory Birds, August 16, 1916, United States-Great Britain (on behalf of Canada), 39 Stat. 1702, T.S. No. 628 [hereinafter "Canada Treaty"]; Convention for the Protection of Migratory Birds and Game Mammals, February 7, 1936, United States-Mexico, 50 Stat. 1311, T.S. No. 912 [hereinafter "Mexico Treaty"]; Convention for the Protection of Migratory Birds and Birds In Danger of Extinction and Their Environment, March 4, 1972, United States-Japan, 25 U.S.T. 3329, T.I.A.S. No. 7990 [hereinafter "Japan Treaty"]; and Convention Concerning the Conservation of Migratory Birds and Their Environment, November 19, 1976, United States-USSR, 29 U.S.T. 4647, T.I.A.S. No. 9073 [hereinafter "Russia Treaty"].

was the case with the ESA, however, silence with regard to Indians is not enough to affect abrogation.

The MBTA authorizes the Secretary to promulgate regulations "as may be necessary to assure that the taking of migratory birds and the collection of their eggs, by the indigenous inhabitants of the State of Alaska, shall be permitted for their own nutritional and other essential needs" in certain circumstances.[90] This parallels the discussion of the ESA's Alaska exemption: while one could argue that this applies the MBTA to everyone other than Alaska Natives, this provision could equally reflect congressional intent to place Alaska Natives on an equal footing with treaty tribes in the conterminous United States. This latter view is reflected in several courts' rejection of the Alaska Native exemption as relevant to the question of reserved hunting rights.[91] Other courts have more generally found there to be nothing on the face of the statute that would suggest congressional intent to abrogate tribal treaty rights.[92]

The MBTA's plain language closely parallels that of the ESA with regard to American Indians and Alaska Natives. Consistent with *Dion* and for the same reasons discussed above with respect to the ESA, we conclude that the text of the MBTA does not demonstrate the necessary congressional intent to abrogate reserved hunting rights.

### 2. The MBTA's legislative history does not suggest clear congressional intent to abrogate reserved hunting rights.

The legislative history of the MBTA and its subsequent amendments is silent regarding reserved hunting rights.[93] While there is some discussion concerning the parameters of, and difficulties associated with, implementing the Alaska subsistence exception,[94] this history does not demonstrate congressional consideration of reserved hunting rights in the conterminous United States. Similarly, federal court analysis of the MBTA's legislative history is scarce. The relevant cases either do not review the history at all,[95] or else defer to the U.S. District Court for the District of Minnesota's conclusion in *Bresette* that the MBTA's legislative history is inconclusive with regard to treaty rights (as opposed to Alaska Native subsistence concerns).[96]

The four underlying treaties implemented by means of the MBTA do not weigh in favor of either interpretation. The Canada Treaty contains a subsistence exception for "Indians" to

---

[90] 16 U.S.C. § 712.

[91] *Bresette*, 761 F. Supp. at 663 ("To treat the consideration of indigenous Alaskans' rights as the consideration of Native American *treaty* rights nationwide, for the simple reason that both groups are regarded as Indians, is disingenuous.") (emphasis in original); *Hawk* at 14-15; *Fiddler*, 2011 WL 2149510, at *5.

[92] *See, e.g.*, *Cutler*, 37 F. Supp. at 725 ("The construction of the [Indian] Treaty here disposes of the question that a public offense . . . is predicated on [the MBTA] which does not apply to the rights of the defendant under the terms of the treaty here."); *Wahchumwah*, 2009 WL 2604779, at *1 (finding that "the MBTA does not apply to Defendants because it did not abrogate the Yakama Indians' tribal rights to hunt migratory birds").

[93] *See, e.g.*, H.R. CONF. REP. NO. 1730, 95th Cong., 2d Sess. (1978); S. REP. NO. 851, 93rd Cong., 2d Sess. (1974); H.R. REP. NO. 243, 65th Cong., 2d Sess. (1918); H.R. REP. NO. 1430, 64th Cong., 2d Sess. (1917); S. REP. NO. 1102, 64th Cong., 2d Sess. (1917).

[94] *See, e.g.*, S. REP. NO. 1175, 95th Cong., 2d Sess., at 7645 (1978) (noting that "subsistence use of migratory birds in Alaska has been one of the most troublesome issues surrounding the implementation of this country's migratory bird treaties").

[95] *See, e.g.*, *Cutler* and *Wahchumwah*, *supra*.

[96] *See, e.g.*, *Fiddler* and *Hawk*, *supra*.

"take at any time scoters for food but not for sale," and states that "Eskimos and Indians may take at any season auks, auklets, guillemots, murres and puffins, and their eggs, for food and their skins for clothing, but the birds and eggs so taken shall not be sold or offered for sale."[97] The Mexico Treaty does not discuss subsistence hunting.[98] The Japan Treaty contains a subsistence hunting provision for "Eskimos, Indians and indigenous peoples of the Pacific Islands" if the taking is for their own food and clothing.[99] And finally, the Russia Treaty permits the "taking of migratory birds and the collection of their eggs by the indigenous inhabitants of … the State of Alaska for their own nutritional and other essential needs."[100]

These provisions demonstrate that the United States entered into the underlying treaties with a focus on preserving subsistence take in Alaska. Moreover, as courts have held, "the legislative history shows that Congress believed amendment of the treaties with Canada, Mexico, and Japan was necessary before regulations permitting subsistence hunting could be adopted" with regard to Alaska Natives.[101] But as *Bresette* noted, these Alaska-specific clauses "do[] not indicate *Congressional* consideration of Indian treaty rights in the United States."[102] And with regard to the mention of "Indians" in the Canada Treaty, "Canada's concerns about the practices of indigenous Canadians," to which the "Indian" language referred, "is irrelevant."[103]

Given the lack of textual discussion and legislative history regarding reserved hunting rights, we do not believe that "Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty."[104]

For the reasons described above, we conclude that the MBTA did not abrogate reserved hunting rights. Accordingly, we recommend withdrawing Sol. Op. M-36936, "Application of

---

[97] Canada Treaty at Art. II(1), (3).

[98] The Mexico Treaty has since been amended by the Protocol Between the Government of the United States of America and the Government of the United Mexican States Amending the Convention for the Protection of Migratory Birds and Game Mammals (May 5, 1997) [hereinafter "Mexico Protocol"], *available at* https://www.congress.gov/105/cdoc/tdoc26/CDOC-105tdoc26.pdf. The Mexico Protocol was designed to bring the Mexico Treaty "into conformity with practice, as indigenous people in Alaska have continued their traditional hunt of these birds in the spring and summer for subsistence and other related purposes despite the prohibition in the 1936 Convention." *Id.* at v. The Mexico Protocol is silent as to its applicability to hunting and fishing outside of Alaska or to treaty rights generally.

[99] Japan Treaty at Art. III(1)(e).

[100] Russia Treaty at Art. II(2).

[101] *Alaska Fish & Wildlife Fed'n & Outdoor Council, Inc. v. Dunkle*, 829 F.2d 933, 941 (9th Cir. 1987) ("[A]s soon as these other treaties can be amended by our negotiators and ratified, we can at least put to rest one of the most longstanding, volatile issues facing rural Alaskan users of migratory birds.") (quoting 124 Cong. Rec. 31,532 (1978)).

[102] *Bresette*, 761 F. Supp. at 663 (emphasis in original).

[103] *Id.* As was the case with the Mexico Treaty, the Canada Treaty was amended by the Protocol between the United States and Canada Amending the 1916 Convention for the Protection of Migratory Birds in Canada and the United States (Dec. 14, 1995) [hereinafter "Canada Protocol"], *available at* https://www.congress.gov/104/cdoc/tdoc28/CDOC-104tdoc28.pdf. The Canada Protocol notably states that the Canada Treaty indigenous exemption "applies to 'inhabitants of Alaska' (understood for the purposes of the Protocol as meaning Alaska Natives and permanent resident nonnatives with legitimate subsistence hunting needs living in designated subsistence hunting areas)." *Id.* at vii. This again emphasizes that the Canada Treaty and its subsequent amendments were not drafted with treaty hunting in mind.

[104] *Dion*, 476. U.S. at 739-40.

Eagle Protection and Migratory Bird Treaty Acts to Reserved Indian Hunting Rights" and Sol. Op. M-27690, "Migratory Bird Treaty Act."[105]

## IV. Conclusion.

This memorandum recommends a departure from previous Departmental treatment of abrogation of reserved rights in the context of the ESA and MBTA. In light of this recommendation, we wish to discuss certain additional considerations regarding the continued viability of the ESA and the MBTA in the face of an affirmative defense of reserved hunting or fishing rights.

First, as described above, this memorandum does not address *Puyallup* and its application to federal conservation statutes. Thus, it remains the position of the United States that the federal government has the authority to enforce the ESA against tribes and tribal members. Further, it is settled law that the States have the ability to regulate reserved hunting and fishing, consistent with the conservation necessity test articulated in *Puyallup*.

Second, this memorandum is not intended to suggest that there is legal support for unregulated take of species otherwise protected by federal conservation statutes by tribes or tribal members. As many courts have observed, when an affirmative defense of reserved hunting or fishing rights is asserted, the applicable inquiry is whether the treaty, statute, or executive order at issue protects the specific, otherwise-prohibited activity. Any initial inquiry requires satisfaction by a federal judge that the treaty parties contemplated that the treaty would cover take of the species now regulated by Federal law.[106] Further, simply because the ESA and the MBTA do not abrogate reserved hunting and fishing rights, it does not follow that such rights extend to any specific hunting technique, location, or licensing requirement(s).[107] Similarly, even if a treaty authorized hunting for subsistence purposes, that treaty likely "does not guarantee commerce in hunted goods as an ongoing usufructuary right."[108] In all cases where the hunting and fishing activities of tribal members extend beyond those protected by reserved

---

[105] Sol. Op. M-27690 was a legal opinion published in 1934 that held that the MBTA abrogated the treaty hunting rights of the Swinomish Tribe ("Swinomish") in the State of Washington. It concluded first that the MBTA "contain[s] no provision excluding the Indians or Indian reservations" from its operation. Next, Sol. Op. M-27690 identified various provisions in the Canada Treaty specifically exempting from the MBTA, demonstrating an intent by Congress to "bind the Indians as well as others." The abrogation analysis employed in Sol. Op. M-27690 is inconsistent with *Dion* and other Supreme Court precedents discussing reserved hunting rights issued subsequent to 1934 (e.g., *Menominee*), namely that the principal question asked when considering congressional intent is not whether a statute specifically *excluded* Indians, but whether it specifically *included* them, thus making its application clear. Sol. Op. M-27690's references to the Canada Treaty are similarly misplaced, and near-identical to those that were disposed of in *Bresette*, discussed supra.
[106] *See, e.g.*, *Makah Indian Tribe v. Quileute Indian Tribe*, 873 F.3d 1157 (9th Cir. 2017) (inquiry as to whether whaling was contemplated by the respondent tribe's treaty fishing right).
[107] *See, e.g.*, *United States v. Gotchnik*, 222 F.3d 506, 511-12 (8th Cir. 2000) (prohibition on use of motor vehicles in national park did not implicate treaty hunting and fishing protection); *United States v. Top Sky*, 547 F.2d 486, 487-88 (9th Cir. 1976) (prohibition on selling eagles commercially did not implicate treaty hunting right); *Wisconsin v. Big John*, 432 N.W.2d 576, 581 (Wis. 1988) (boat-registration requirement does not implicate treating hunting and fishing rights).
[108] *See, e.g.*, *Crooked Arm*, 2013 WL 1869113 at *1 (rejecting a treaty defense to an MBTA prosecution for trafficking in bird parts).

rights, such activities are subject to regulation by federal conservation statutes of general applicability, as would be any other conduct.[109]

      Third, and relatedly, this memorandum is consistent with case law holding that various authorities may regulate treaty-protected tribal hunting and fishing activities in certain circumstances. For example, in *Wahchumwah*, the U.S. District Court for the District of Nevada held that a treaty hunting right does not imply "a tribal right to hunt eagles for non-religious commercial purposes because eagles are a religious symbol and therefore are to be used only for religious purposes."[110] Such limitations must be determined on a case-by-case basis according to the expectations of the tribal signatory at treaty making.[111]

      Finally, this memorandum is not intended to suggest that any non-Indian (or any other non-beneficiary of a treaty right) may evade federal prosecution simply because they engaged in the hunting, fishing, or barter of a protected species with an Indian.[112] The scope of this memorandum is limited to the applicability of federal conservation statutes to tribal members who enjoy a federally-protected right to hunt and fish. That protection does not exist beyond the treaty beneficiary, except as otherwise authorized by a federal court decision or applicable statute.

---

[109] For example, pursuant to the MBTA, the United States Fish and Wildlife Service recently published special migratory bird hunting regulations for certain Tribes on Indian reservations, off-reservation trust lands, and ceded lands. 85 Fed. Reg. 53,247 (Aug. 28, 2020).

[110] 2009 WL 2604779, at *1; *accord Dion*, 752 F.2d at 1264 (finding that "no expectation of a treaty right to sell eagles existed, since there was no historical evidence of a practice of selling eagle parts and since such a practice was deplored as a matter of tribal custom and religion").

[111] *See Choctaw Nation v. United States*, 318 U.S. 423, 432 (1943) (treaties "are to be construed, so far as possible, in the sense in which the Indians understood them").

[112] *See, e.g., Fox*, 573 F.3d at 1055 ("It surely is not the case that Navajos are immune from prosecution for fraud, drug offenses, antitrust violations, insider trading, or any other number of federal crimes by virtue of the fact that the United States guaranteed hunting rights to their tribe.").